Good morning. May it please the court. I'm Michael Mushkin. I'm here on behalf of the plaintiff below J.B. Carter Enterprises doing business as ATM Merchant Systems. I want to stress three specific points, and that is that there was clear evidence and an admission that the company knew the statements that were made were false. The intent is also clear, as the company wanted to keep the business of ATM Merchant Systems. Damages are both calculable and as a result of intentional acts, and therefore the economic loss doctrine applies only to the negligence claim. ATM Merchant Systems provides cash advance and account services to casinos. In September of 2010, Defendant Elavon began serving as processor for ATMMS credit debit card transactions. In 2012, the credit card industry announced a new technology called EMV to authenticate credit debit card transactions. EMV uses computer chips embedded in cards to prevent fraud. They did not exist in 2010. On October of 2015, liability for disputed transactions shifted from the issuing bank to the merchant for non-EMV transactions. Complete change to the network. It is undisputed that from 2012 through 2015, Elavon represented numerous times it would be ready for EMV by the deadline, and that certain Equinox L5200 terminals it sold would be EMV enabled. ATMMS purchased 197 of the L5200 terminals in reliance on Elavon's representations. Elavon eventually announced that the L5200 terminals would never be EMV enabled. Elavon knew ATMMS's casino clients were- Counsel, I want to ask you about one part of your fraud claim. I'm not going to- this question doesn't go to the date part, the when they're going to be ready part, but about the EMV enabled part. What is the evidence that you would point to that the seller made knowing representations about whether the Equinox L5200, which were being sold, were going to be EMV enabled, as opposed to the issue as to dates? Because you have two basically distinct kind of fraud claims, right? Yes, sir. Although the district court acknowledged the numerous false statements proffered by Elavon, the court erred in finding the evidence does not show that Elavon knowingly communicated false target dates to ATMMS. Right, I understand that, that the district court ruled that as to the target dates, but with regard to the equipment itself, I don't think the district court discussed that, and I'm trying to see where in the record there's evidence that supports your claim of knowing falsely. That was my next sentence. Okay, sorry. And I would point to the Carmichael Deposition 162.7 through 164.18, wherein this questioning takes place. Why didn't anybody tell AMS a couple of months before September they weren't going to have this until 16? This was the first we were hearing it too. This means that inside of Elavon the decision was made, but that you people that were dealing with ATMMS didn't know. You were making representations to them that you believed were true, but this decision had already been made above you not to support the LS5200 until sometime in 16 at the earliest. And there's a series of questions back and forth, and he answers, that's what it appears. That is what it appears to me. And I understand how that goes to the date issue, but your brief talks about at the time you purchased the Equinox L5200, Elavon planned that it would be compatible with EMV. What is the evidence that supports that statement, that those kind of statements were false, were knowingly false? The evidence is that their statement and their testimony is that they decided to do Canada first. This was a knowing business decision to not support that machine. They simply made the determination to do it otherwise, and interestingly enough to this date the replacement machine still doesn't do it. They went away from the LS5200, had us buy more machines, and then still didn't make that EMV ready. So they not only knew on the 5200, they made a conscious business decision, and I apologize that I can't point directly to the specific portion of the testimony. I'd like to reserve some time and I'll find it for you. This was something that was known. This was not an unconscious act. They knowingly decided to apply their resources in another place as opposed to the representation they made to this customer that they would be compliant on the date in question. And the specific testimony is about they decided to do Canada first. That's why I reference it. They knew. They knew from the beginning. And the machines, the process, the entirety of it. I hope I answered your question. I understand your answer. Thank you. May I continue? Please do. So, after the close of discovery, ATMS filed a motion for partial summary judgment on the issue of liability only for its fraud, negligent misrepresentation, intentional interference with contractual relations, and intentional interference with prospective business relations. Elavon also filed a motion for summary judgment claiming a master agreement between ATMMS and Elavon barred the alleged oral contract that Elavon would be EMV compliant by the deadline. The district court sided with Avalon and granted summary judgment in favor of ATMMS' contract claims. The district court also granted summary judgment in favor of Elavon on the tort-related claims, finding that although ATMMS established virtually all tort elements, ATMMS did not show that Elavon knowingly communicated false dates to ATMMS. The district court also declined to infer intent from Elavon's knowledge of ATMMS' relationship with casino clients and the unique impact of the pin-debit delay on these clients concerning the intentional interference with contractual relations and intentional interference with prospective business claims for relief. The elements are not in dispute when we cite to Halcom. As I pointed out earlier, the district court acknowledged the numerous false statements and I pointed you to the deposition transcript. Counsel, if I might, on what basis did your client have a right to rely on these statements? Isn't that one of the elements you have to prove? Yes, sir. And the right comes as a result of the change of the network. The network changes. This is not contemplated in that master agreement. And in the evidence, it shows that every other client, Elavon considered the merchant, the end user, to be their customer, but that ATMMS is a separate provider and the end users, the casinos, are acknowledged not to be the customers of Elavon. They are ATMMS' customers. Does that make the oral contract then related to the written contract and subject to the terms of the written contract in terms of modification? No, it's outside of that contract. That is the point that we're making. These promises are outside the scope. The entire network is having a shift in liability, a change. Would your client have been free to seek chip services from another entity? Absolutely. And had they told us they weren't going to be compliant, we would have done exactly that. Yes, sir. Your Honor, that is the nail struck squarely on the head. They are our processor. It is reasonable for us to rely on them. I guess that my problem is if you're free to do that, then how can you say you had a right to rely on the representations? Well, I mean, there are two businesses. One business is trying to sell to another business. Each business, they're free not to give you services. You're free to seek services elsewhere. I'm not sure I fully understand the question, but it takes months and millions of dollars to establish the processing relationship and the serviceability for the clients. This is not something where you flip a switch. So this relationship was established in 2010. The entire industry changed. What you're saying is that the ongoing relationship between the two is why there was a right to rely? Yes, sir. All right. You're down to a little over three minutes. Would you like to reserve the rest of your time? Yes, ma'am. Yes, Your Honor, I would. Good morning, counsel. Good morning. May it please the court. Joseph Wendt representing Respondent Elevon, Inc. The district court was right to enter judgment against ATMMS's breach of contract claims. ATMMS wants the court to ignore the language of the master agreement. Which language, counsel? So there are a number of defined terms that bear on this dispute, and I would direct the court first to page 550 of the supplemental excerpts. In there, we learn that the master agreement contemplates ATMMS marketing merchant services offered by Elevon to prospective merchants. But why is the fact that you have a contract where the purpose of the agreement is MSP shall refer to Elevon and members prospective merchants meeting the qualifications, etc. Why? And this is an agreement that doesn't mention whether these terminals are going to be enabled or not enabled. Why would an agreement that a particular piece of equipment was going to have some characteristic or not be outside, be something that wouldn't be subject to a separate agreement? I mean, this agreement only collaterally covers the purchase of equipment, right? Well, the only reason that ATMMS has the ability to acquire equipment is under the terms of the master agreement. And that's set forth at page 566 of the supplemental excerpt. So do you have that in front of you? I do, correct. Okay, so I guess everybody agrees that there was some supplement to this schedule that at some point listed the 5200, right? Correct. But it's not in the record. The testimony is in the record. Yeah, but at the top where it says customizable equipment program, you see that? I do, correct. What does customizable mean? Customizable gives the MSP the opportunity to become like a class B merchant, which is in this case, a customer that wants to present and market its own custom program to its own customers. So under this, it lists some equipment with some prices, right? Correct. And so what if they had said to you, we're buying this for the red casino, this particular equipment, and the red casino's decor is red. And so we need the 5200 to be red. And the salesman says, absolutely. We have an agreement. It's going to be red. And then they deliver black ones. Is that also, in your view, barred by the integration clause, that oral agreement? No, that would not be barred by the oral agreement. So if that's not barred, why would the agreement that these are going to be enabled, absolutely, these are going to be EMV enabled, why would that be barred? Well, the representation regarding the EMV enablement of the piece of equipment is not a component of the breach of contract claim. Well, that's – I mean, maybe I'm – That's a misrepresentation. Maybe I'm misreading what their oral contract claim is, that these are at some point going to be – that they're somehow going to be at some point able to handle this. So they have the ability to acquire EMV enabled devices. And that's that discussion about the new device, the Ingenico. The way they get to acquire EMV enabled equipment is under the terms of the master agreement. The status of the representations regarding the enablement of the subject equipment is a component of the fraud claim. And that's where they have to show that knowingly false misrepresentations were made at the time. And that's where that claim fails. Is there anything in this agreement that states that Elevon will provide financial processing services to ATMMS? If you look at 550 of the supplemental excerpts. Okay. Section 2.1, the recruitment of merchants. I read – I didn't see in there anything that said that there will be financial processing services provided to ATMMS. Well, what ATMMS was going to do was market the merchant services. And the merchant services is a defined term that incorporates the term payment device, which is also broadly defined to incorporate new financial transaction processing methods developed after the execution of this agreement. So it comes under the scope of the master agreement in connection with merchant services. Going back to my previous question, I thought that the alleged oral agreement had two parts. That Elevon promised to provide ATMMS with EMV by the shift date and that the L5200s would be EMV enabled. Am I misreading what's in paragraph 74 of the complaint? I would submit that the evidence was that the term of the alleged oral contract would be that they would provide EMV enabled devices. I don't think it boils down to the specificity of that we would provide the L5200 as EMV enabled at the time that the alleged oral contract was formed. You would see that the Exhibit C to the master agreement, it doesn't identify the L5200 because that contemplates new devices and methods. Right. It doesn't list it, but they say that's the oral agreement. I mean, what I'm reading in paragraph 74, they entered into an oral agreement where you agreed that you'd be ready for the transition to EMV and that you'd provide point of sale devices that could accept the chip cards as well as the magnetic strips and contactless payments. And I'm just having a hard time seeing how that alleged oral agreement is in any way covered by the master agreement. So, I think the concern boils down to the specificity about the L5200. If a business decision is made subsequent to the formation of the master agreement that the L5200 would not be the specific device that would be EMV enabled, that should not be used to form the basis of a breach of an oral contract. If the claim is simply that the LMI would provide EMV enabled devices, well, then that occurred. They got possession of EMV enabled devices, whether it's the L5200. But not the ones that they claim they bought pursuant to the oral contract, that it would be these devices. And so that's the issue of their oral contract. How many did they buy? My understanding was 197 L5200 units. And their claim is that they were told these were going to be the ones, right? They claim that they relied on a misrepresentation. But to prove a misrepresentation, there has to be a knowingly false at the time it was made misrepresentation. And there's no evidence of that. I mean, but I go back to what your friend was citing from, and I apologize that I'm going to mispronounce his name, but Mr. Priblek's testimony, which is from a business priority, we chose to support Canada. And that because of that, we weren't going to support these other devices. So why wouldn't the fact that some people at your company knew that these target dates were never, ever, ever going to be met because you were prioritizing Canada, why wouldn't that support, in the light most favorable to the non-moving party, a material issue of fact as to Cienter, as opposed to the judge in this case saying, well, he just wasn't going to make the leap to find Cienter? I will point to a couple of items. The first is that this development timeline was described as moving target development. And when you're involved in a beta program, you know that problems are encountered, analyzed, and overcome, which is part of the point of a beta program. And so moving target development indicates exactly this. The spirit and intent of it is to develop programs and overcome problems that ensue in connection with that beta program. So moving target development does not support an understanding that at the time they were providing, conveying dates and timetables, that those were not grounded in fact, that they were totally untethered to reality. Well, the way I read it. It sounds like those are arguments that you could make to the jury, and they can choose to accept that argument, or they can choose to accept the inferences that Mr. Mushkin is going to argue on behalf of his client that, you know, knowing, prioritizing the Canadian project, and that took a couple of years to complete. But at the same time, kind of stringing J.D. Carter along, it gives rise to an inference that somebody knew that these target dates were not going to be met. They're inferences. Who knows whether the jury would accept it, but I think that's what a trial is for, right? Well, I would submit that there's no evidence that those representations were made without a basis in fact, that were made with reckless disregard or materially misstated or omitted facts. I would also submit to the court that not every goal that goes unmet, not every estimate that goes unachieved, not every projection that is unachieved should give rise to the basis for a fraud claim for a plaintiff. You have to have a knowingly false misrepresentation when it was made, and that's the challenge, that they have to identify evidence that there was a knowingly false misrepresentation, or that timetables were given in material disregard of the facts, or that they misstated or omitted facts. There's a particular Nevada case on points, the Boldman case that's cited in the briefs, that not every failure to fulfill a promise gives rise to a fraud claim. There has to be some intent of the promissory to not perform. Again, I think that the jury might be persuaded by that, but here there's such a big disconnect between the target dates that were given, and the fact that now how many years, I think three years later, still it didn't happen, coupled with the testimony that the Canadian project was prioritized, I think that's enough to go to the jury. Target dates that are established and conveyed, that are communicated and updated, that providing the client with updates as development progresses, and that as priorities shift over time, should not provide the basis for a fraud claim. Except counsel here, these are target dates that caused, at least from the plaintiff's perspective, purchases, and delaying other purchases, and plaintiff claims that the evidence supports the view that the target dates at the time they were given, that a jury could find that your company knew that these would never be met. And while in the abstract, a target date is a target date, if you're giving somebody a target date of 2015, and a jury could find that the company knew that 2015 was never going to be possible at the time the target date was given, in the light of the plaintiff, why wouldn't that support a fraud claim? There would have to be evidence in the record of that. I don't think you can defeat a summary judgment motion based on allegations, and that could possibly be the case. Counsel, I want to turn to one unrelated to this claim issue. The reason the district court granted summary judgment on the interference claims was the court found that the plaintiff didn't identify any evidence that Elavon delayed the functionality with the intent of disrupting contractual relations or harming ATMMS. And the way I read Nevada law, which adopts the restatement, and I'm looking at the Las Vegas Tonopah Reno stage line case, is the district court concluded that the intent required for this tort is that the defendant be substantially certain that interference with a commercial relationship will occur and not that there be an intent to actually harm. And so why isn't that directly contrary to the rule announced by the district court that there has to be evidence of an actual intent to disrupt as opposed to knowledge with certainty that that's going to happen? I would suggest that the intent element exists in connection with this claim. Mere knowledge of the contract should not be used to infer every time that making a decision that has an adverse impact on that relationship equals intent. Absolutely. And the way I read this case and the restatement is there are a number of factors, but one of them is not the one the district court found, that you absolutely have to have the actual subjective intent to disrupt. If you're substantially certain that's going to occur. And it seems to me that there's evidence in the record from which a reasonable jury could find that your client knew because it was constantly told about what the plaintiff was going to do with this equipment, that it knew, and it's related to the casinos, that it knew that not getting the EMV-enabled equipment or not meeting the shift-day target would significantly disrupt prospective advantage or actual extent contracts. I would submit two points for the court's consideration on that question. The first is nothing in the record suggests that Elavon made his decision regarding timetables and adjusted them or formulated them in any way so as to adversely impact ATMMS. That connection still has to be there in connection with the intentional interference claims. And the second point I would submit to the court is ATMMS cannot explain how hurting ATMMS' casino relationships would be in Elavon's interests. Elavon's revenue is generated in part through transactions processed by merchants recruited by ATMMS. So damaging those relationships would have a corresponding effect on Elavon. That intent element is missing in connection with this claim. I would ask the court to affirm the district court opinion. All right, thank you very much. There's some rebuttal time. Help me out with something, counsel. It looks like you're still on mute. Sorry, I'm sorry, I'm sorry. Help me out with something, counsel. I'm looking at the supplemental excerpts of record 551 and specifically under the heading services provided by Elavon, 3.1.3 talks about chargeback and retrieval processing and then 3.1.5 talks about referring merchant statement processing and ACH file preparation. Can you explain to me a little bit what that's about in the short time that you've got left? Does that have any software or equipment functionality? Yes. The ACH is a, you and I would probably think of it as a wire transaction, but it's a checklist check. And all of these functionalities operate based upon software integrated into the equipment. What that portion references is the steps and the types of things that the functionality will be. In this case, unfortunately, with the shift, everything changed. And that's sort of the whole point of this. That everybody knew in advance on this date there's going to be a shift. And thus, all of this is done to try and get in preparation of that. I hope I answered your question. Yes, but let me ask a follow-up question. So if these provisions refer to essentially integration of software, then why isn't the oral contract really a written modification? Why does that require a written modification? There's a shift in technology, right? But isn't that an extension then of these particular provisions that we were just talking about, 3.1.3 and 3.1.5? No, because this changed the entire network. This is not just a customizing. This is not anything that these parties did. This is outside of these parties. Totally new, unanticipated technology. And interestingly enough, the part of this that I find most interesting is the shifting of liability. That was not anticipated, and it's happening outside the scope of the relationship of these parties. That was sort of the gravitas. And the notion that within the contract, they're representing this customizable thing. Representing all along, we're going to be ready, we're going to be ready. The industry changed. And then Judge Bennett was asking the question, and I can't pronounce Priszecki's name either, Prisblecki. At 32.7 through 18, they admit our product was never striving to be ready for EMV deadlines. That's just a direct misrepresentation. Was there any attempt by anyone to your knowledge at Elevant to find a solution whereby Commerce SDK would support EMV pin debit for ATMMS? Answer, no. There can't be any more evidence any more direct than that. So that issue of intent, respectfully, I think is overcome. I thank you for hearing me, and I appreciate the opportunity to be before you today. Thank you very much, counsel, for both sides of your argument today. The matter is submitted.
judges: Nguyen, Harpool, Bennett